# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### October 28, 2014 Session

## STATE OF TENNESSEE v. ROGER WAYNE HENRY, JR.

**Appeal from the Criminal Court for Davidson County**
**No. 2012-B-955    Monte D. Watkins, Judge**

———————————

**No.  M2013-02490-CCA-R3-CD - Filed January 16, 2015**

———————————

The Defendant, Roger Wayne Henry, Jr., was found guilty by a Davidson County Criminal Court jury of aggravated sexual battery, a Class B felony.  *See* T.C.A. § 39-13-504 (2014). The trial court sentenced the Defendant to nine years and six months at 100% service.  On appeal, he contends that (1) the evidence is insufficient to support his conviction, (2) the trial court erred by restricting his cross-examination, (3) the trial court erred by allowing the State to elicit inadmissible hearsay testimony, (4) the trial court erred by failing to order the State to play all of the Defendant's recorded statements to the police, (5) the trial court erred by failing to grant trial counsel's motion to withdraw, (6) the trial court erred by denying his requests to continue the trial and for funds for an expert, and (7) the trial court erred by failing to compel the State to produce the police file relative to the victim's acting as a confidential informant.  We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JOHN EVERETT WILLIAMS and ROGER A. PAGE, JJ., joined.

Manuel B. Russ, Nashville, Tennessee, for the appellant, Roger Wayne Henry, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Victor S. (Torry) Johnson III, District Attorney General; and Hugh T. Ammerman II and Tali Rosenblum, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

At the trial, Metropolitan Police Officer Sean Williams testified that on January 22, 2012, at 2:19 a.m., he responded to a possible rape call.  He said the victim reported that she was raped at gunpoint.  The victim was visibly shaken but composed and not crying at the

scene. Officer Williams did not think the victim was under the influence of drugs or alcohol. The victim was alert and coherent. The victim provided consistent statements to two additional officers, and she identified the Defendant as her attacker from a photograph obtained by Officer Williams from the police computer system.

Officer Williams testified that he took the victim to the hospital for an examination, that he spoke to Metro Police Detective Heather Baltz at the hospital, and that he left for the Defendant's residence. He and additional officers arrived at the Defendant's house around 5:20 a.m. He said that they received information that the Defendant was home but that he would not answer the door when the officers knocked and announced their presence. The Defendant's wife arrived about forty-five minutes later and consented to a search of the house. As the Defendant's wife opened the door, the Defendant "appeared out of the doorway," and the Defendant was arrested.

On cross-examination, Officer Williams testified that the victim did not appear to have been experiencing withdrawal symptoms. He observed her for about two hours. He agreed that the Defendant opened the door to the house and came outside. He recalled the Defendant was holding his child at the time.

The victim testified that she was previously convicted of burglary, theft of property, filing a false police report, three counts of criminal impersonation, theft of services, and identity theft. She also had a pending theft charge and said the prosecutor had not offered anything in exchange for her testimony in the present case. The victim had a history of bipolar disorder with acute anxiety, severe paranoia, and post-traumatic stress disorder. She was diagnosed when she was a teenager and had received treatment regularly since her diagnoses. She stated that she was taking her prescribed medications on the night of the incident but that it had been forty-five days since she last took her medications because of her arrest in the pending theft case. She said she was able to recall the events on the night of the incident.

The victim testified that she knew the Defendant before the incident. She had seen the Defendant on two previous occasions. On the first, the Defendant paid her for oral sex. On the second, the Defendant gave her a ride to her friend's house. She said the Defendant was not violent on those occasions, which occurred a few months before the incident.

The victim testified that at 1:00 a.m. on January 22, 2012, she was walking down the street to her friend's house to borrow money when she saw the Defendant drive by two or three times. She said that although she did not recognize the driver at first, she noticed the Blazer made a distinctive noise like the Defendant's Blazer. She said the Blazer stopped, and the driver asked if she wanted a ride. She told the driver she wanted a ride to her friend's

house, opened the door, and saw the Defendant in the driver's seat. She said she had engaged in prostitution regularly and knew when a car was circling her. She admitted she wanted to borrow money from her friend to purchase crack cocaine. She said she last used cocaine two days before the incident.

The victim testified that she told the Defendant she was "dope sick" and needed to purchase drugs. She asked him for $10, and the Defendant responded, "That's fine. . . . Do you have a problem with me going by my house first?" The Defendant's baby was in the backseat, and the Defendant said he needed to change the baby's diaper and to get a bottle. The victim agreed to go to the Defendant's house. The Defendant gave her the money before they arrived at his house. She said no agreement existed for sex in exchange for the money, and she did not anticipate having sex with him because she was sick.

The victim testified that after they arrived at the Defendant's house, he placed the baby carrier in one of the bedrooms. She noticed that the only furniture inside the house was the bed. She said she sat on the edge of the bed, and the Defendant placed his jacket on the floor. She said that the Defendant began to stand over her and that he made her nervous. She said the Defendant unzipped his pants and told her he wanted her to perform oral sex. She said the Defendant had "changed" and was no longer nice to her. She performed oral sex on the Defendant and said she felt as though the Defendant forced her to do it. She said that afterward, the Defendant said he wanted her to have sex with him. She told the Defendant no. She said that at that point, the baby was screaming and crying but that the Defendant did not check on the baby.

The victim testified that she asked the Defendant, "What are you going to do, rape me?" and that the Defendant said, "You might as w[e]ll give it to me. What are you going to do, call the police? You're a prostitute." She said the Defendant reached for his jacket and pulled out a gun. She said that he told her to remove her pants, and she complied. She said he taped her hands behind her back with blue painter's tape. The victim pleaded for her life, and the Defendant told her that he would not harm her if she cooperated. He first wanted her to lie on her stomach, but he permitted her to lie on her back when she expressed fear that he would anally penetrate her. She said the Defendant wore a condom and penetrated her for about one to one and one-half minutes. She said that afterward, the Defendant allowed her to get up, and he removed the tape. He left the bedroom to check on the baby.

The victim testified that the gun was semi-automatic, was "thick," and was a dull-black color and that the gun remained within the Defendant's reach during the incident. She asked the Defendant if she could leave, and the Defendant told her that she could not leave and that he would drive her where she wanted to go. As they walked to the Blazer, the

Defendant asked if she was going to run. She said she knew the Defendant still had the gun and told him that she would not run. The Defendant placed the baby inside the Blazer and the gun inside the driver's door, although she was not certain that was where he placed it. She said that during the drive to her friend's apartment, the Defendant threw the blue tape and the condom out the window. She said that he asked her several times if she was going to call the police and that she told him she would not call them. She said that she thought the Defendant would have killed her if he thought she was going to report him to the police. The Defendant pointed to his son in the backseat and told the victim that if she reported him to the police, the authorities would take away his son.

The victim testified that when she got out of the Defendant's Blazer, she was able to get a partial license plate number. She walked to her friend's apartment, told her friend what happened, and they walked to a pay phone to call 9-1-1. The pay phone was not operational, and they walked to Advanced Financial, where an employee called the police. When the police arrived, she gave them directions to the Defendant's house. The police officers drove to the Defendant's house based on the victim's directions, and she identified the house after seeing the Defendant's Blazer in the driveway. The officers identified the Defendant based on the license plate number from the Blazer, obtained a photograph of the Defendant, and showed it to the victim. The victim identified the Defendant from the photograph and told the police that he raped her. They left the area and drove the victim to the hospital for an examination.

The victim testified that she did not know the responding officers or the woman at Advanced Financial who called the police. She said she spoke with Detective Baltz at the hospital. She denied telling the detective that she did not feel as though she was "totally forced to perform oral sex" and said she told the detective that she was "uncomfortable and, kind of, nervous and scared, that's why I performed oral sex." The victim said that at that time, she did not feel like the Defendant was going to force her but that she felt as though something bad might happen if she did not cooperate based on her previous experiences. She agreed she did not tell the Defendant no until he told her that he wanted to have intercourse and displayed a handgun.

The victim testified that in 1993 or 1994, she met a woman named Belinda, who was married to her friend, John "J.J." Poindexter. She said she knew the couple in passing but was not close to them. She said she last saw Belinda six to ten years before the incident in this case and was unaware that Belinda previously lived in the Defendant's house. She said her "ex," Robert Foster, lived in the neighborhood previously but not in the area where the Defendant lived. She said she only stayed with Mr. Foster a few times and did not know anyone who lived in the area. She said that Mr. Foster was sentenced to prison in 2005 and that she had not been to his house since then.

A recording of the 9-1-1 call was played for the jury. In the recording, the victim said she was walking to visit a friend when a man driving a Chevy Blazer offered to give her a ride. She identified three digits of the license plate number. The victim said the man drove to a house. She said it looked as though the residents were moving. The man took the victim into the house, placed a condom on himself, and made her perform oral sex. The man had a baby, whom the man called Noah, in the Blazer and brought the baby inside the house. She said the man pulled out a black nine-millimeter handgun and pointed it at her. She said the man laid down the gun, taped her hands behind her back with blue tape, and raped her. The victim said she was scared and cooperated. She said the man was Caucasian and wore a black jacket, jeans, and a cap. She said her friend, John Poindexter, knew the man.

On cross-examination, the victim testified that she did not know Mr. Poindexter and his wife Belinda were related to the Defendant and that she did not meet the Defendant through the Poindexters. When asked if she met the Defendant while at Mr. Poindexter's apartment, she said that she was not certain whether she met him and that the incident to which trial counsel referred occurred ten years before the incident in this case. She denied having conversations or a sexual relationship with the Defendant ten years previously. She admitted that she "had been with" the Defendant on other occasions in 2011 and 2012.

The victim testified that on the night of the incident, she knew the Defendant's voice before she entered his Blazer. She said that she did not use cocaine on the night of the incident, that she last used drugs twenty-four to forty-eight hours previously, and that she was dope sick during and after the incident. She agreed she was "shaky," agitated, irritable, and sick to her stomach and wanted to sleep. She denied, though, that the symptoms affected her thought process or made her angry. She admitted to regular use of cocaine.

Relative to the victim's criminal charges for making a false police report, she testified that she pleaded guilty to one count and that another count was dismissed. She agreed her theft of property conviction was a misdemeanor and said she gave the police a false name on three occasions because she feared outstanding warrants for her arrest. Relative to the identity theft conviction, the victim explained that she was scared and hiding from an abusive boyfriend, that she used someone else's identification at the hospital, and that she was attempting to prevent her boyfriend from learning her location. She denied having entirely fake identification and said the information belonged to her sister. She said all of her previous convictions occurred before the incident in this case. She agreed she was a witness for the State in a pending homicide case.

The victim testified that her bipolar disorder caused periodic aching, depression, mood swings, stress, anxiousness, and excitement. She said that her post-traumatic stress disorder caused flashbacks of past experiences but that she knew the difference between a flashback

and reality. She agreed her stress disorder amplified the bipolar disorder symptoms. She had clinical anxiety and paranoia, which caused her to think someone was watching and talking about her. She said her paranoia was worse since the incident in this case. She said that when her disorders were active, she ran and hid from people. She described herself as a loner and said she stayed to herself and avoided confrontation.

The victim testified that she did not recall previously telling trial counsel that she was not taking her psychiatric medications at the time of the incident and said she had been taking her medications at that time. She agreed she used drugs while taking her medications. She said cocaine numbed her body and slowed her thoughts. She said cocaine only calmed her. She said Depakote and cocaine affected her the same way. She said she took Zoloft before taking Depakote.

The victim testified that the Defendant did not permit her to stay in the Blazer while he and the baby went inside the house. She said that the Defendant did not know her well and that she would not have permitted someone she barely knew inside her car unattended. She said, though, that the Defendant did not force her inside the house and that he told her to come inside because it was cold.

The victim testified that although the Defendant did not force her to perform oral sex, she felt uncomfortable and scared. She said that the look in the Defendant's eye scared her and that she did not know what would happen if she refused. She agreed she told the detective that the Defendant did not force her and that the Defendant did not threaten her or display a gun at that time. She said the Defendant pulled out the gun when he began talking about intercourse. She agreed the Defendant put on a condom after he tied her hands but did not recall telling the nurse or testifying at the preliminary hearing that the Defendant wore a condom during oral sex. She said, though, that she was pretty sure he did not put it on until after she performed oral sex. She agreed some details were unclear.

The victim testified that the Defendant bound her hands with painter's tape three or four times and that she was unable to break free because she had very little strength in her arms as a result of a car accident. She said she had red marks on her wrists from the tape for about thirty minutes after it was removed. She agreed she took her clothes home after the medical examination and burned them because she did not want to see them again. She denied becoming angry with the Defendant, demanding more money, and threatening him if he did not give her more money. She denied "looking for work" on the street when the Defendant picked her up. On redirect examination, the victim testified that she was not charged in the pending homicide case in which she was a witness.

Detective Heather Baltz testified that she worked in the sex crimes unit and that she first met the victim at the hospital. She said the victim was disheveled, upset, hungry, cooperative, and articulate. She said that although the victim was coherent, she was unable to determine if the victim was under the influence. She obtained a statement from the victim, and the victim underwent a medical examination and a drug screen. The victim's urine was positive for cocaine. The evidence collected during the examination was taken to the Tennessee Bureau of Investigation (TBI) Crime Laboratory for analysis. She said a swab from the victim's mouth was taken before the victim was permitted to eat. She said the Defendant's DNA was not found on any of the swabs obtained during the examination.

Detective Baltz testified that she recorded the victim's interview at the hospital. In the recording played for the jury, the victim stated that she walked to a friend's house but that her friend was not home. She was walking down the street when she noticed a vehicle circling the block. The driver eventually stopped and asked if she needed a ride. She recognized the man because he had given her a ride previously and because she had "oral business" with him previously. She told the man she needed a ride, got in the Blazer, and saw a baby in the backseat. The man told her that he lived nearby and that he needed to check on something. She described the inside of the man's house and where he placed the baby. The man told her that she could sit on the bed in his bedroom because that was the only furniture inside the house. She noted that it looked like the residents were moving.

The victim stated that she asked the man if she could borrow $10, and the man gave her the money. She said that after he gave her the money, he told her he wanted something in exchange for it. The victim asked what the man wanted, and he told her that he wanted oral sex. She said she was nervous and uncomfortable. She told him no, and the man grabbed her arm, told her to sit down, and told her to take off her jacket and shirts. She told the man she did not want to take off her clothes, and the man told her to pull up her shirts and her bra. The victim said that the man put on a condom and "made [her] do oral." She clarified that he did not force her but that she was scared not to cooperate. She denied there was an agreement for sex in exchange for money.

The victim stated that after she performed oral sex, the man told her that he wanted intercourse. The victim told him no, and the man said, "You might as well give it to me anyway. What are you going to do, call the police? You're a prostitute." She said the man grabbed his jacket from the floor and pulled out a gun. The man told her to place her hands behind her back, and he taped her hands together. The man wanted her to lie on her stomach, but she did not want to because she feared being raped anally. He allowed her to lie on her back but required her to sit on her hands. She said that the gun was at the foot of the bed under a sheet and that the man acted as though he was going to grab the gun during the incident. Afterward, she learned that she knew someone who knew the Defendant.

The victim stated that after the man finished, the baby began to cry. The man went to pick up the baby while holding the gun. The victim wanted to leave and said she was willing to walk. The man would not permit her to walk and said he did not trust her. The victim told him that she was not going to run from him and that he could drive her to a friend's apartment. They walked to the Blazer. She said that the man "reached" for something and that she did not know if he put the gun in the door. The man asked if she was going to call the police, and the victim said she would not. She got out of the Blazer as quickly as she could, and he left.

The victim did not know the man's name but was later told the Defendant's name by a police officer. She said her friend John "J.J." Poindexter knew the man. She said that she last saw the Defendant in October, when he gave her a ride. She said she had performed oral sex on the Defendant sometime before October. She said, though, that the Defendant probably saw her with Mr. Poindexter. The victim said the man was nervous but did not seem drunk or intoxicated. She agreed to conduct a "controlled" telephone call. She said that the man threw out the tape he used to bind her hands but that some of the tape was left inside the house.

Detective Baltz testified that she asked the victim to participate in a controlled telephone call during which the victim would contact the Defendant at the direction of the police and attempt to obtain admissions from him. The victim wanted to participate and did not hesitate in providing her consent. Detective Baltz said, though, that a controlled call was never made because the Defendant was arrested later that night.

Detective Baltz testified that she went to the Defendant's house after the victim's interview. When she arrived, other officers were already there. She said they knocked on the door several times, announced their presence, turned on their blue lights, used a police cruiser's loud speaker to talk to the Defendant, and obtained a telephone number for the house. She said that they called the number, that someone answered, that the person hung up, and that the person turned off the phone. She said the Blazer described by the victim was in the driveway. When the Defendant did not exit the house, she left to obtain a search warrant. She said that while she was gone, an officer told her that the Defendant's wife, Sunshine Henry, arrived and that she had access to the house. The Defendant's wife signed a waiver and consented to the police's entering the house and the vehicle. When Detective Baltz returned to the scene, the Defendant was inside a police cruiser.

Detective Baltz testified that Ms. Henry lived with the Defendant at the house and that she consented to the search of the Blazer. The detective saw a few personal items and furniture inside the house and said it looked as though the residents were moving. She found blue tape inside the house and found a roll of tape and a "wad" of blue tape in garbage near

the roadway. She said a gun was not found inside the house or Blazer. She denied any of the officers looked under the house. During her investigation, Detective Baltz spoke with the Defendant's father and sister about the gun's possible locations, but a gun was never found. Relative to the items the victim said the Defendant threw out the window of his Blazer, Detective Baltz said officers searched the probable route driven by the Defendant but found nothing.

Detective Baltz testified that she spoke with the Defendant while he was in the backseat of the police cruiser. The Defendant agreed to speak with her, and she recorded the interview. In the recording, the Defendant was told that the woman whom he spent time with that night had alleged he raped her. He was told that the police were there to process his house as a potential crime scene and to look for evidence related to the alleged rape. The Defendant said nobody had been in his house. The detective read the Defendant his *Miranda* rights. He denied picking up a woman earlier that night or having a woman in his Blazer. The detective noted that the front seat did not have any items on it, and the Defendant said his baby sat in the front seat. He denied his son sat in the backseat. The Defendant denied knowing the location where the victim said she was dropped off after the incident.

The Defendant refused to acknowledge whether he saw the victim and said his version did not matter. The detective explained that a portion of the victim's conduct was consensual and that she was undergoing a medical examination. The detective told the Defendant that if the victim's DNA were found on his body or if his DNA were found on the victim's body, she would know the Defendant was lying. He said he was confident no DNA would be found. The detective told him that she found blue tape inside the house, which was consistent with the victim's allegation. The Defendant denied previously paying for intercourse or oral sex. He denied "hanging out" with any known prostitutes.

The Defendant stated that he had been home packing that night because they were being evicted. They were moving to a hotel until they received a tax refund. He said he drove his wife to work at 9:00 p.m. He stayed "up there" until 10:30 or 10:45 p.m. He came home, cleaned, and put their belongings in boxes in order to take them to their storage unit. He said he took one load to the storage unit before taking his wife to work. He denied leaving the house after returning home from taking his wife to work. He said he stopped at the Exxon station after dropping off his wife.

When asked why a random girl would tell the police she was picked up by the Defendant, brought to the Defendant's house, be able to provide a description of his Blazer and his license plate number, and claim he raped her at gunpoint, the Defendant asked if she was "serious." He asked if the woman was a prostitute and a "crack head." When asked if

he wanted to prove that he did not have the victim's DNA on his body, he said yes. The Defendant consented to a medical examination, and the interview ended.

Detective Baltz testified that the Defendant initially denied any involvement with the victim, involvement with a prostitute, and possessing a gun. The Defendant agreed to a medical examination. She drove the Defendant to the hospital where swabs were taken and submitted to the TBI laboratory for analysis. She told the Defendant that if DNA were found, it would look bad for the Defendant, given his statement that he had never seen the victim.

On cross-examination, Detective Baltz testified that she was present for the search of the Defendant's house. She agreed blue tape was found in two rooms but primarily in the bedroom. She said Ms. Henry stayed inside the house while she interviewed the Defendant, but she admitted it was possible Ms. Henry left the house without her knowledge.

Detective Baltz testified that the only information she had about J.J. was the information provided by the victim. She said the victim claimed J.J. knew the Defendant, but the victim did not explain their relationship. She agreed some furniture was inside the house. She said the Defendant seemed surprised that the allegation was rape while using a weapon. She said that although she did not have an arrest warrant, she clearly told the Defendant that he was in police custody and read the Defendant his *Miranda* rights. She said that her decision to arrest the Defendant depended on his statement and that if the Defendant had a reasonable explanation, she would have consulted the district attorney's office the following morning to determine if a prosecution was warranted. She was told at the hospital that the victim was a known prostitute, which indicated to her that the victim probably had a lengthy criminal history and a history of drug abuse.

Detective Baltz testified that although the Defendant did not open the door to his house, he did not obstruct the search after Ms. Henry consented. She did not tell the Defendant that she could have sought a warrant for a medical examination if he chose not to consent. She said the Defendant made additional statements to her at the hospital during the examination. She said that although semen was found on one of the vaginal swabs taken from the victim, the analyst at the TBI laboratory was unable to "confirm . . . the source of that semen." She said that the TBI laboratory was not equipped to perform "Y-STR testing," which was a more sensitive DNA comparison analysis. She said that in some cases, it was advisable to send samples to a private laboratory for the test, and in other cases it was not advisable. She agreed the samples in this case were not sent to a private laboratory for further DNA testing in an effort to identify the source of the DNA.

Detective Baltz testified that she was not qualified to determine whether the victim experienced withdrawal symptoms at the hospital. She said, though, that the victim's demeanor did not appear to be abnormal.

On redirect examination, she stated that she did not learn of the victim's previous convictions until after the arrest warrant was obtained but that she knew the victim had a criminal history before she obtained the warrant. She decided to obtain the warrant based on the totality of the circumstances. She concluded that the victim was credible based on her investigation and that the Defendant was unreliable. She said the victim was articulate and provided details about the incident and the location where it occurred.

Sheriff's Investigator Kevin Carroll testified that he was an administrator of the inmate recorded telephone system at the Criminal Justice Center. He identified twelve telephone calls placed on January 22, 2012, and one call placed on January 28.

In the first telephone call, the Defendant spoke with Ms. Henry and denied any wrongdoing. Ms. Henry said that the victim knew their son's name and about the blue tape inside the house. The Defendant said the victim knew J.J. and was a "crack head."

In the second call, the Defendant spoke with his father, who asked what happened. The Defendant denied any wrongdoing and said he was cleaning the house. The Defendant said J.J. and Belinda, who were previous tenants at the house, knew the victim. He said the victim came walking down the street and was "all cracked out." The victim asked for Belinda, and the Defendant told her that Belinda did not live there anymore. He said that the victim wanted money and that he attempted to "push her away" to get back inside to his son. The victim asked the baby's name, and the Defendant told her that his son's name was Noah. He denied that the victim entered his house. When asked how the victim knew about the blue tape, he said he threw away the roll while the victim was outside. He said he did not need the tape anymore. When asked why he did not open the door when the police arrived, he said he was "freaking out."

In the third call, the Defendant talked to his sister Tonya. When she asked if "it happened," he said, "Not like that, no." He admitted the victim was inside his house. He said he "didn't do anything to that woman." The Defendant said, "It was over money." He said money "sparked her off."

In the fourth call, the Defendant told Tonya that he did not pick up the victim and that she was walking down the road. He denied tying up the victim. He said he did not have the money to pay the victim and asked Tonya not to judge him. He denied "looking for it" and

said he was stupid. He asked, "How are you supposed to rape a prostitute[?]" He said that the victim did not say she was going to call the police and that the victim "ran off."

In the fifth call, the Defendant told Tonya that he was going to kill himself. She told him to tell the truth about what happened. He said that he let his anger take over and that he should not have done that but that the "b---- wouldn't leave." He denied a gun was at the house. She said "they" could get the gun, if there were one. The Defendant began to tell her a gun's location but the call ended.

In the sixth call, Tonya told the Defendant that she wanted to know where the gun was located. He told her to go to the "backside" of the house where the "skirt" was "pulled out." He said the "keys" were there, and Tonya said she was going in the next few minutes. He told her not to tell Ms. Henry about it. The Defendant's father came to the telephone, and the Defendant denied using those keys. He said the keys had been there for a long time. He wanted Tonya to go to his house immediately.

In the seventh call, the Defendant talked to Ms. Henry. He told her that he was terrified that he was going to lose her and his son. In the eighth call, Ms. Henry said that she knew the Defendant was probably going to prison and that he was not going to receive probation. He said that if no DNA or gun was found, how could the rape be aggravated? He asked how the State could show that the sex was not consensual. Ms. Henry said the blue tape was found hidden in the trash, but the Defendant claimed it was not hidden. He denied raping the victim, and Ms. Henry said it did not matter. She said he deserved to serve time for the crime he committed.

In the ninth call, the Defendant talked to his father, who told him that Tonya went to the house but did not stop because Ms. Henry was home. The Defendant asked to speak with Tonya, who said a red truck and a tan car were at the house. The Defendant said Ms. Henry was at the lake, and he asked Tonya to return to the house because he "needed it gone." She agreed to go to the house, and the Defendant said he would call back later to confirm it was done.

In the tenth call, the Defendant spoke to his father. The Defendant said he learned Ms. Henry was on her way home and asked if Tonya had left. His father said he could not believe the Defendant did what he was accused of doing. The Defendant said he "f----- up." The Defendant said he was going to call and distract Ms. Henry in order to give Tonya additional time. In the eleventh call, Tonya told the Defendant that she drove to his house and that she did not stop. The Defendant yelled at Tonya and said Ms. Henry was not there. Tonya agreed to drive to his house again. In the twelfth call, Tonya told the Defendant that she got the keys. He said the keys were important. In the thirteenth call, the Defendant

spoke to his father. The Defendant asked what Tonya did with the keys because he feared the police might search his father's house. His father said she "got rid of them."

Bethsaida Camacho, an expert in family practice and emergency room medicine, testified for the defense that she was a nurse practitioner and that she worked as a sexual assault medical examiner. She examined the victim on January 22, 2012, for two to three hours. She said the victim appeared sleepy and was calm and cooperative. She was not aware if a toxicology analysis was performed. She agreed the victim disclosed her mental health history and her medications. Ms. Camacho found no bruises, abrasions, or scratches during the examination. She did not notice any tape residue on the victim's body. She said the victim reported that the Defendant wore a condom during the "entire sexual encounter," including when she performed oral sex.

On cross-examination, Ms. Camacho testified that the victim reported that she asked the Defendant for $10, that the Defendant gave her the money, and that he demanded she perform oral sex on him in return. The victim reported that she performed oral sex on the Defendant and that she was afraid for her life. She said that when she refused to have intercourse with the Defendant, he argued with her while pointing a gun at her. The victim reported that the Defendant forcefully turned her around, tied her hands, threw her on the bed, and penetrated her vagina with his penis. Ms. Camacho said the victim was clearheaded, communicated effectively, responded to questions, and understood what was happening.

On redirect examination, Ms. Camacho testified that she was unable to confirm or exclude the possibility of sexual penetration. She asked the victim to leave her clothes for evidence, but the victim declined. On recross-examination, she stated that she did not always expect to find injuries and tearing from a sexual assault.

TBI Special Agent Laura Boos, an expert in DNA and serology, analyzed the evidence in this case. She found spermatozoa on the victim's vaginal swab, but the number of sperm found on the sample was limited, which might result from a low sperm count. She was only able to determine the presence of the victim's DNA. She said that although she knew male DNA was present in the sample, testing conducted by the TBI could not determine the DNA profile. She said, though, the Y-STR test could target the male DNA to determine the profile. She said that the test was performed by private laboratories and that she believed she mentioned to the district attorney's office the Y-STR test might identify the male DNA profile in this case.

The Defendant testified that he did not rape the victim and that he did not force her to do anything. In 2003, he met the victim through his cousin, J.J. Poindexter, but she was just an acquaintance. The Defendant lived with Mr. Poindexter for a while, and he said the victim came to their apartment once or twice a week. He said that the victim had a crush on him and that he and the victim had a couple of "oral sexual encounters." He said that he moved to his own apartment a few months later and did not see the victim again until 2010. He saw the victim at a convenience store. She asked him for a ride, and he drove her to where she needed to go. The Defendant said that he and Ms. Henry married in 2010 and that he saw the victim twice in 2011. He said he saw the victim in mid-2011 and paid her for oral sex. Four months later, he gave the victim a ride, but he denied having sexual contact with her then.

The Defendant testified that on January 22, 2012, he and his wife were packing their belongings. He took his wife to work at 9:00 p.m., stopped at a convenience store for gas, and returned home with his infant son to continue packing. Between 12:15 and 12:30 a.m., he went to the grocery store for milk and a pack of cigarettes. He recognized the victim standing at a stop sign. On his way home from the store, the Defendant saw the victim standing in the same place. He said that he circled the block and stopped and that the victim got in his Blazer without his asking.

The Defendant testified that after the victim was inside his Blazer, she asked why he was out late, and he asked her if she was working as a prostitute. The victim responded that she was and asked the Defendant what he wanted. The Defendant told her that he wanted oral sex, and he said the victim requested $30. The Defendant said he only had $10, and the victim accepted it. After taking the money, the victim suggested they park somewhere, but the Defendant did not want to park because his son was in the backseat. He suggested going to his house, and the victim agreed.

The Defendant testified that they entered the bedroom at his house. He noticed the victim was agitated and in a hurry because she needed drugs. The Defendant lay on the bed and gave the victim a condom, which she put on him. After she performed oral sex on him, she went to the restroom. When she returned, she wanted more money. The Defendant told her that he did not have any more cash and that he was not "a check card." He said the victim became agitated and angry and claimed $10 was not enough money to buy what she needed. He said they returned to the living room, where the victim began to pace. The Defendant said he became irritated and told the victim that she could either leave or that he would drive her anywhere she wanted. The victim said she wanted a ride.

-14-

The Defendant testified that during the drive, the victim continued to demand more money and wanted him to go to the bank. He said his wife had their bank card. He said the victim stated that he would regret what he did. He drove her to an apartment and did not see her again that night. He returned home and finished packing and cleaning the house. Afterward, he fell asleep and did not know the police were outside until he awoke. He heard the police calling his name on a police cruiser's loud speaker. He denied hearing the police for twenty minutes before he answered the door.

Relative to his recorded statement, the Defendant testified that he was not honest initially and that he was scared because his wife was with the police and the police talked about a prostitute. He said he realized mid-conversation with the detective that he was being accused of rape. He initially thought that the victim had "gotten caught up with something" and that he was in trouble for solicitation. When he learned of the rape accusation, he immediately volunteered for the medical examination. At the hospital, he told the detective that the oral sex was consensual, but the detective did not want to hear what he had to say. He said he told the detective the truth when he was away from his wife.

The Defendant testified that the jail telephone calls on January 22, 2012, were made during the first four or five hours of his arrival at the jail. He said he was "freaked out" to be in jail. He said he and his sister discussed a .380 Lorcin nickle-plated pistol. He kept the gun outside his house because his wife did not want it inside. He said it was a poor choice to talk to his sister about moving the gun because it made him look guilty. He asked his sister to move the gun because he was being accused of using the gun and because he initially did not tell the detective about it. He said he panicked. He denied having the gun during his encounter with the victim and said the gun was not inside the house at any time.

The Defendant testified that since his arrest, he and Ms. Henry separated and that he did not see his son much. He said he was initially untruthful with the detective because he feared losing his wife and son. He denied using tape to bind the victim's hands and forcibly penetrating her.

On cross-examination, the Defendant testified that the gun was kept under the house in a storage compartment with the lawn mower. He said his wife knew about the gun, but he did not recall Detective Baltz telling him that his wife told the detective that he had a gun. He said that mid-conversation with Detective Baltz, he became "pretty certain and sure" his wife knew the substance of the allegation.

The Defendant testified that he lied to Detective Baltz relative to the gun and attempted to make the detective believe that his wife only knew about a gun he had years previously. He said that he had only paid the victim for sex one other time. He did not know if patronizing prostitution was a misdemeanor.

The Defendant agreed with the victim's testimony they had oral sex using a condom. He said the victim completed the sex act before asking for more money. He said she became irritated because she was not going to be able to purchase enough drugs. He said the victim never mentioned going to the police, only that he would regret it. He said that the victim demanded a ride and that he complied because she had "no place to go around here." When asked what happened to the gun, the Defendant said his father told him that his sister "got rid of it." He agreed his testimony was the only evidence showing that his gun did not match the victim's description. He agreed he was convicted of theft months before the incident.

Detective Baltz testified in rebuttal that the Defendant made additional statements at the hospital. The Defendant told her that he needed to explain and wanted to give another story "or excuse for the situation." She said the Defendant denied raping the victim and claimed the victim was mad because he did not have any money. The Defendant begged her not to take him to jail.

On cross-examination, Detective Baltz testified that the Defendant's second statement was made shortly after the first statement. She said, though, the second statement was not the result of a second interview. She said that she did not interview the Defendant and that he blurted out the statements. She agreed the Defendant said that he did not rape "that girl" and that there was a dispute about money.

Upon this evidence, the Defendant was convicted of aggravated sexual battery. The trial court sentenced him to nine years and six months' confinement at 100% service. This appeal followed.

# I

## Sufficiency of the Evidence

The Defendant contends that the evidence is insufficient to support his conviction for aggravated sexual battery. He argues that his testimony discredited the victim's testimony. The State responds that the evidence is sufficient. We agree with the State.

-16-

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521 (Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997); *see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see also State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated sexual battery is defined, in relevant part, as "unlawful sexual contact with a victim by the defendant or the defendant by a victim . . . [when] force or coercion is used to accomplish the act and the defendant is armed with a weapon[.]" T.C.A. § 39-13-504(a)(1) (2014). Sexual contact includes "the intentional touching of the victim's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." *Id*. § 39-13-501(6) (2010) (amended 2013). Intimate parts are "the primary genital area, groin, inner thigh, buttock or breast of a human being." *Id*. at (2).

The jury's verdict reflects that it credited the victim's testimony relative to the Defendant's use of force or coercion and his displaying a gun during the course of unlawful sexual contact. The credibility of the witnesses and any conflicts in the evidence were resolved by the jury, and this court will not reweigh or reevaluate the evidence. *See Bland*, 958 S.W.2d at 659; *see also Sheffield*, 676 S.W.2d at 547. The evidence reflects that after the victim and the Defendant arrived at the Defendant's house, the Defendant stood over the victim, making her nervous. The Defendant wanted the victim to perform oral sex, and she complied because the Defendant's demeanor changed. The victim felt as though the Defendant forced her to perform oral sex. Afterward, the Defendant wanted to have intercourse, and the victim said no. The Defendant told her that she "might as w[e]ll give it to me. What are you going to do, call the police? You're a prostitute." The Defendant pulled a gun from his jacket and told her to remove her clothes. The victim complied, and the Defendant taped her hands behind her back. The victim pleaded for her life, and the

Defendant said he would not harm her if she cooperated. The victim cooperated, and the Defendant penetrated her vagina with his penis while the gun remained on the bed within his reach. The evidence is sufficient. The Defendant is not entitled to relief on this basis.

## II

### Restricting Cross-Examination

The Defendant contends that the trial court erred by restricting his cross-examination of the victim relative to her charged criminal conduct that did not result in convictions. The State responds that the trial court did not abuse its discretion because the charged conduct was not probative of the victim's character for truthfulness. We agree with the State.

Evidence is relevant and generally admissible when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Tenn. R. Evid. 401, 402. Questions regarding the admissibility and relevancy of evidence lies within the discretion of the trial court, and the appellate courts will not "interfere with the exercise of that discretion unless a clear abuse appears on the face of the record." *State v. Franklin*, 308 S.W.3d 799, 809 (Tenn. 2010) (citing *State v. Lewis*, 235 S.W.3d 136, 141 (Tenn. 2007)).

Tennessee Rule of Evidence 608(b) states, in relevant part, that

[s]pecific instances of conduct of a witness for the purpose of attacking . . . the witness's character for truthfulness, other than convictions of crime as provided in Rule 609, may not be proved by extrinsic evidence. They may, however, if probative of truthfulness or untruthfulness and under the following conditions, be inquired into on cross-examination of the witness concerning the witness's character for truthfulness or untruthfulness. . . . The conditions which must be satisfied before allowing inquiry on cross-examination about such conduct probative solely of truthfulness or untruthfulness are:

(1) The court upon request must hold a hearing outside the jury's presence and must determine that the alleged conduct has probative value and that a reasonable factual basis exists for the inquiry; [and]

(2) the conduct must have occurred no more than ten years before commencement of the action or prosecution[.]

By contrast, Rule 609 permits the use of previous convictions to impeach a witness's credibility so long as the crime was punishable by death or imprisonment of more than one year or the crime involved dishonesty or false statements. Tenn. R. Evid. 609(a)(2).

At a pretrial hearing, the victim testified that in 2010, she was charged with harassment and retaliation for past action but that the charges were dismissed. She explained that her former boyfriend, Robert Foster, filed "bogus" harassment charges against her. She said Mr. Foster violated his parole and was sentenced to prison for the violation. While Mr. Foster was in prison, she began dating someone else. After his release, she said he attempted to break up her new relationship. She said Mr. Foster threatened to hurt himself and contacted her regularly. He sent text messages of photographs of pill bottles and various images of things he wanted to do. She said that she refused to go to Mr. Foster's house. She said that he later claimed she was calling him continuously, which she denied, and that she was charged with retaliation. Her cell phone included all of the text messages she received and was provided to her attorney. The district attorney's office retired one charge and requested dismissal of the other.

The victim testified that when Mr. Foster sent her a photograph of a pill bottle, he asked her to come to his house. She refused, and her new boyfriend told her to call the police for a welfare check. She called the police, and Mr. Foster became angry when the police responded. Mr. Foster convinced the police that she had called and texted him numerous times throughout the day, and the police arrested her. She said Mr. Foster told her that if he could not have her, he was going to make her life miserable. She denied contacting Mr. Foster after her arrest and denied threatening him if he testified against her. While in police custody, the victim told a friend, Margaret Hale, that she wanted Mr. Foster to leave her alone. The victim's attorney told her that Ms. Hale told Mr. Foster to leave the victim alone and to tell the prosecutor that he had lied, although the victim did not know for sure if Ms. Hale talked to Mr. Foster. She said, though, Ms. Hale told her attorney that Mr. Foster was the guilty party.

The trial court excluded evidence relating to the harassment and retaliation charges. The court noted that the victim repeatedly denied guilt and found that one charge was retired and the other was dismissed at the State's request. Trial counsel argued that although the victim was not convicted of harassment and retaliation, the incidents were admissible as "prior acts that show dishonesty." The court found that the charges were inadmissible.

The victim further testified at the pretrial hearing that in 1999, she was charged with two counts of making a false report. One count was dismissed, and she was convicted of the other count. The prosecutor told the trial court that he intended to ask the victim at the trial if she was convicted of making a false report. Relative to the dismissed count, the victim

stated that she told the police that her then-boyfriend, Grady Russell, "drove erratically" and assaulted her, causing soreness in her shoulder. She later admitted to the police that she lied to "get back at her boyfriend." She said, though, that both counts came about during an abusive domestic relationship. Trial counsel argued the factual basis was a prior act of dishonesty and appropriate for impeachment.

The trial court found that trial counsel could question the victim about her prior criminal history because credibility was critical to the case. The court found that her convictions were probative of her credibility. The court stated that it was a "free form of cross-examination."

Relative to the victim's being charged with, but not convicted of, harassment and retaliation, we conclude that the trial court did not abuse its discretion by barring the Defendant from questioning the victim about these offenses. Although the Defendant argues that evidence of the charges shows that the victim harassed and retaliated against a former boyfriend and was relevant based on the Defendant's testimony that the victim said he would "regret what [he] did," our rules of evidence do not permit such an intended use. Tennessee Rule of Evidence 404 prohibits evidence of a prior bad act to prove that a witness acted in conformity with that act. *See State v. Wyrick*, 62 S.W.3d 751, 771 (Tenn. Crim. App. 2001). Rule 609 also did not permit cross-examination because the victim was not convicted of the offenses.

Relative to Rule 608, the offenses were not probative of the victim's character for truthfulness or untruthfulness. We note that the Defendant fails to cite to any authority stating that harassment and retaliation are probative of truthfulness. The victim vehemently denied engaging in the alleged conduct. Although the victim testified that she was told Ms. Hale spoke to Mr. Foster about the charges, no proof was presented at the jury-out hearing that the victim had knowledge of Ms. Hale's intent to speak to Mr. Foster. We note that although the Defendant states in his brief that the relevant charges were dismissed "for failure to prosecute," the victim testified that Mr. Foster appeared in court and that the district attorney requested dismissal of one charge and retired the other. The trial court did not abuse its discretion.

Although the Defendant focuses on the harassment and retaliation charges, he also mentions that he should have been permitted to question the victim about the dismissed filing a false police report charge. The record shows, though, that during cross-examination, trial counsel asked the victim about her 1999 conviction for making a false report. The victim admitted that she pleaded guilty to one count and that a second count of making a false report was dismissed. The victim agreed that making a false report involved calling the police and reporting something as truth when it was false. The record fails to show that the trial court

restricted the Defendant's cross-examination relative to the dismissed filing a false police report charge.

In any event, the Defendant was permitted to question the victim about her previous criminal convictions, including filing a false police report. On direct examination, the victim testified that she was previously convicted of burglary, theft of property, filing a false police report, three counts of criminal impersonation, theft of services, and identity theft. She also had a pending theft charge and said the prosecutor had not offered her anything in exchange for her testimony in the present case. On cross-examination, trial counsel questioned the victim extensively about her previous convictions. The victim testified relative to her conviction for making a false police report that she pleaded guilty to one count and that the other count was dismissed. She agreed her theft of property conviction was a misdemeanor and said she gave the police a false name on three occasions because she feared outstanding warrants for her arrest. Relative to the identity theft conviction, the victim explained that she was scared and hiding from an abusive boyfriend, that she used someone else's identification at the hospital, and that she was attempting to prevent her boyfriend from learning her location. We note that although the State objected, counsel questioned and the victim admitted she was a State witness in a pending homicide prosecution. The Defendant is not entitled to relief on this basis.

## III

### Hearsay

The Defendant contends that the trial court erred by allowing the State to elicit inadmissible hearsay testimony through evidence of the victim's recorded police statement. The State argues that the trial court did not abuse its discretion by admitting the statement but that if admission of the statement was error, it was harmless beyond a reasonable doubt. We agree that the statement was properly admitted.

"'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tenn. R. Evid. 801(c). Hearsay is generally inadmissible except as provided by the rules of evidence or otherwise by law. *Id*. at 802. "Prior statements of witnesses, whether consistent or inconsistent with their trial testimony, constitute hearsay evidence if offered for the truth of the matter asserted[.]" *State v. Braggs*, 604 S.W.2d 883, 885 (Tenn. Crim. App. 1980) (citing *Mays v. State*, 495 S.W.2d 833 (Tenn. Crim. App. 1972); *Johnson v. State*, 596 S.W.2d 97 (Tenn. Crim. App. 1979)).

-21-

As a general rule, evidence of prior consistent statements is inadmissible to rehabilitate an impeached witness. *Id*. However, "prior consistent statements may be admissible . . . to rehabilitate a witness when insinuations of recent fabrication have been made, or when deliberate falsehood has been implied." *State v. Benton*, 759 S.W.2d 427, 433 (Tenn. Crim. App. 1988); *see State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998). In order to be admissible, the witness's "testimony must have been assailed or attacked to the extent that the . . . testimony needs rehabilitating." *Hodge*, 989 S.W.2d at 725. If admitted for the purpose of rehabilitating a witness, the statement is not hearsay because it is not admitted to prove the truth of the matter asserted. Neil P. Cohen et al., *Tennessee Law of Evidence* § 8.01[9] (6th ed. 2011). Additionally, a trial court must instruct the jury that the prior consistent statement cannot be used for the truth of the matters contained therein. *State v. Meeks*, 867 S.W.2d 361, 374 (Tenn. Crim. App. 1993); *see Braggs*, 604 S.W.2d at 885.

During Detective Baltz's direct examination, the State offered the victim's recorded interview into evidence. The Defendant objected on the ground of hearsay and noted that the victim had previously testified. The State argued the recording was a prior consistent statement "by a witness who . . . already testified and been cross-examined." The trial court permitted the State to play the recording, but it did not explain the basis for its ruling.

The record reflects that the trial court did not err by admitting the statement as a prior consistent statement. During the victim's cross-examination, trial counsel asked questions related to her mental health history and the medications she was prescribed at the time of the incident. Likewise, counsel inquired about the victim's cocaine use, and she admitted continuous use and to being dope sick at the time of the incident. Counsel asked about the victim's previous criminal history, which included making a false report, theft, and criminal impersonation convictions. Counsel's questions clearly implied that the victim was unable to recall properly the events of the incident based on her mental health and drug use and that the victim had a history of being dishonest. As a result, the State was entitled to rehabilitate the victim's testimony by playing the statement. The recording was consistent with the victim's trial testimony, which would have provided the jury an opportunity to assess the victim's credibility.

Although the trial court did not err by admitting the prior consistent statement, the record reflects that the court did not provide a contemporaneous limiting instruction to the jury that the recording was not to prove the truth of the matter asserted but only to provide a basis for assessing the victim's credibility. *See Meeks*, 867 S.W.2d at 374; *see Braggs*, 604 S.W.2d at 885. We note, too, that the Defendant did not request a limiting instruction after the trial court permitted the State to play the recording. Likewise, the final jury instructions read to the jury are not included in the appellate record, and this court will not speculate whether the court provided the appropriate instruction. In any event, the statements were

consistent, and if the court failed to instruct the jury, any error was harmless. The Defendant is not entitled to relief on this basis.

## IV

## The Defendant's Statements to the Police

The Defendant contends that the trial court erred by failing to order the State to play all of the recording of the Defendant's police statement. He argues that he provided two statements to the detective and that the entirety of both statements should have been played for the jury pursuant to Tennessee Rule of Evidence 106, the rule of completeness. We note that although the Defendant refers in his brief to two recorded statements, only one statement was recorded. The State responds that the trial court properly denied admission of the unrecorded statement and that the substance of the statement was introduced during the Defendant's testimony. We conclude that the trial court did not abuse its discretion.

Tennessee Rule of Evidence 106 states, "When a writing or recorded statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." "[W]here the prosecution introduces a statement made by the defendant, the trial court may in the interest of fairness order that the remainder of the statement be admitted as well under Rule 106." *State v. Keough*, 18 S.W.3d 175, 182 (Tenn. 2000).

Before the trial, trial counsel requested clarification regarding the use of the Defendant's recorded statement provided at the scene and his non-recorded statement provided at the hospital. The State intended to introduce the recorded statement the Defendant made while being detained outside his house, but it did not intend to introduce the statement he made at the hospital because the statement was self-serving hearsay. The prosecutor noted that the detective ended the interview before taking the Defendant to the hospital. At the hospital, the Defendant made an additional statement to the detective. The prosecutor argued that the statements were separate and that the Defendant's statement at the hospital was unsolicited by the detective and was self-serving. Counsel argued that the Defendant gave one continuous statement because he was in police custody and that the State was required to introduce evidence of the Defendant's statement at the hospital.

The trial court permitted the State to introduce the recorded statement made outside the Defendant's house. The court found that trial counsel was not precluded from questioning the detective about whether the Defendant made an additional statement at the hospital but that counsel was not permitted to question the detective during cross-

examination about the substance of the hospital statement. Counsel renewed his objection during Detective Baltz's testimony, and the trial court reiterated its previous ruling. Nothing in the record, though, reflects that the trial court limited the Defendant's testimony regarding the substance of the hospital statement.

We conclude that the trial court did not abuse its discretion by preventing the Defendant from questioning the detective about the substance of the hospital statement. Relative to Rule 106, the statements in this case are not a single, continuous statement. The detective ended the interview outside the Defendant's house, and the Defendant was then driven to the hospital. It was not until the Defendant was undergoing the medical evaluation that he admitted to having a consensual sexual encounter with the victim and claimed that the victim became angry when he refused to pay her additional money. Likewise, the statement at the hospital was not the product of questioning, unlike the interview outside the Defendant's house. At the house, the detective recorded the interview and asked the Defendant questions. The Defendant's statement at the hospital was unsolicited, was not the product of police questioning, and was not recorded. We note that Rule 106 pertains to *recorded* or *written* statements. The hospital statement was only noted in the detective's police report.

Relative to the self-serving nature of the statement, this court has stated,

A declaration made by a defendant in his own favor, unless part of the res gestae or of a confession offered by the prosecution, is not admissible for the defense. A self-serving declaration is excluded because there is nothing to guarantee its testimonial trustworthiness. If such evidence were admissible, . . . an accused could create evidence for himself by making statements in his favor for subsequent use at his trial to show his innocence.

*Hall v. State*, 552 S.W.2d 417, 418 (Tenn. Crim. App. 1997) (quoting 3 *Wharton's Criminal Evidence* § 303 (13th ed.)). The State had no obligation to present the Defendant's self-serving statement. In any event, the Defendant testified regarding the substance of his hospital statement and explained why he was initially untruthful with the detective. The Defendant is not entitled to relief on this issue.

V

**Motion to Withdraw as Counsel**

The Defendant contends that the trial court erred by failing to grant trial counsel's request to withdraw during the trial. He argues that counsel's pretrial interview of the victim

resulted in counsel being a witness to the victim's prior inconsistent statements. The State responds that the trial court did not abuse its discretion. We agree with the State.

A trial court "may, upon good cause shown, permit an attorney appointed under this part to withdraw as counsel of record for the accused." T.C.A. § 40-14-205(a) (2012). A trial court "has wide discretion in matters regarding the appointment and relief of counsel, and its action will not be set aside on appeal unless a plain abuse of that discretion is shown." *State v. Branam*, 855 S.W.2d 563, 566 (Tenn. 1993). "[W]hen the need for an attorney to testify is brought about by testimony of other witnesses during trial, . . . [counsel's] competency to testify is discretionary with the trial court." *State v. Johnson*, 685 S.W.2d 301, 304 (Tenn. Crim. App. 1984).

During a break in the trial, trial counsel informed the trial court that the victim provided inconsistent testimony regarding her mental health at the time of the incident. The relevant testimony focused on whether the victim was taking her prescribed medications for her mental health disorders at the time of the incident. He said that although the victim testified that she was taking her medications at the time of the incident, she told counsel during his interview of her before the trial that she was not taking her medications. Although the victim's attorneys in another case were present during the interview, they did not recall the details of the victim's statement. Counsel said he was a witness to those statements and felt obligated to withdraw as counsel because her mental health status was critical for cross-examination. Counsel noted that the victim also testified that she did not know the Defendant but that she told counsel that she had known J.J. Poindexter and the Defendant "from a long time ago." Counsel suggested that another attorney call counsel as a witness regarding the victim's prior inconsistent statements. The trial court denied the motion and stated that "lawyers find themselves in that position all the time."

Counsel submitted his notes from the interview to the trial court. We have reviewed counsel's notes and have found only one reference to the victim's medications and mental health. Counsel wrote, "No prescriptions or any other narcotics in her system. OCD, Anxiety, PTSD, Bipolar diagnosis since 18 years old & she's been to MTMH in the past & Centerstone. She's been on suicide watch. At the time of offense, she had not been going to the doctor."

We conclude that the Defendant has failed to show that the trial court abused its discretion. Although trial counsel's notes show that the victim was not being treated by a physician at the time of the offense and that she had no prescriptions or narcotics in her system at time of the incident, the victim testified at the trial that she was taking her medications and that her testimony could be confirmed by her medical records. Counsel asked the victim on cross-examination if she recalled telling counsel before the trial that she

was not taking her medications. She adamantly denied telling counsel that she was not taking her medications. In any event, counsel highlighted the victim's prior inconsistent statements about taking her medications, and such statements are "admissible for the purposes of impeachment and testing the credibility of the witness." *Jones v. Lenoir City Car Works*, 392 S.W.2d 671, 673 (Tenn 1965). The jury was free to determine whether the victim was taking her medications at the time of the incident and whether any lack of medication affected her ability to recall the details of the incident. We note that counsel highlighted numerous grounds from which the jury could have discredited the victim's testimony, including her previous criminal history, her mental health history, and her drug addiction. The Defendant is not entitled to relief on this issue.

## VI

### Motion to Continue

The Defendant contends that the trial court erred by denying his request to continue the trial and his request for funds for an expert. He argues that he was entitled to a continuance to have additional scientific testing conducted on the evidence and that he was entitled to funds for an alcohol and drug abuse expert to assist the jury in understanding the victim's mental state as an admitted drug abuser. The State responds that the Defendant failed to prepare an adequate record on appeal and that as a result, the trial court's ruling is presumptively correct. We note that since the State filed its brief, the record was supplemented with the transcript from the hearing on the Defendant's motion. We conclude, though, that the Defendant is not entitled to relief.

"[A] motion for a continuance is addressed to the sole discretion of the trial judge," and the judge's decision "will not be disturbed in the absence of a clear showing of gross abuse of discretion to the prejudice of the defendant." *Baxter v. State*, 503 S.W.2d 226, 230 (Tenn. Crim. App. 1973). It is the appealing party's burden to show how the trial court's decision was prejudicial. *Id*. The critical inquiry "is whether one has been deprived of his rights and whether an injustice has been done." *Id*. As a result, the record must reflect that "the denial of the requested continuance 'denied the defendant a fair trial or that the result of the trial would have been different.'" *State v. Vaughn*, 279 S.W.3d 584, 598 (Tenn. Crim. App. 2008) (quoting *State v. Odom*, 137 S.W.3d 572, 589 (Tenn. 2004)).

The record reflects that trial counsel filed a motion to continue the trial, in relevant part, to secure an expert who would testify regarding the effects of the victim's mental illnesses and her drug abuse at the time of the incident. Likewise, the Defendant requested a continuance to have the vaginal swabs undergo additional testing to identify the DNA profile of the semen found during the victim's examination. Counsel noted in his motion that

the TBI agent who conducted the analyses told him that additional testing could identify the source of the semen but that such testing was not performed by the TBI laboratory.

At the motion hearing, trial counsel stated that he had the names of several experts who might be able to assist in presenting evidence relative to how the victim's mental health and substance abuse problems impacted her at the time of the incident. Counsel said any expert would not be ready for trial the following Monday. Counsel said that an expert in this area was critical to impeaching the victim's ability to recall and accurately testify to the facts of the alleged incident. Relative to the additional testing of the vaginal swabs, counsel stated that Agent Boos told him four to six months previously that TBI standard testing did not include an additional test that could identify the source of the semen. Agent Boos told counsel that the test had to be ordered by the trial court or by the State. Counsel told the court that the Defendant was adamant the semen did not belong to him and that the additional testing would support his claim.

Relative to the expert witness, the State questioned whether the defense could find an expert willing to testify that the victim's ability to recall the events on the night of the incident was impacted due to her mental health and drug problems. The prosecutor believed that, at most, a defense expert might testify that the victim's mental health and drug abuse could have impaired her ability to recall the events. Relative to the additional forensic testing, the prosecutor stated that he had no intention of presenting evidence of the DNA linking the Defendant to the offense. The prosecutor stated that it would have been unlikely to find the Defendant's DNA because the victim claimed the Defendant wore a condom and that in all likelihood the semen belonged to someone else given that the victim was engaged in prostitution.

The trial court found that the identity of the source of the semen was not a "real issue" because the victim was a known prostitute and that a continuance was not needed. Relative to the expert, the court found that "to a large degree [that is an] issue[] for the jury, as to whether her mental health state had any effect on her credibility." When counsel noted that he would be left with the victim's statement that her mental health and drug problems did not affect her ability to recall the events, the court stated it thought "that most jurors would not agree with that conclusion . . . . They would say it had some [e]ffect. Now to what degree, . . . I am not going to try to say what the jury will conclude. . . . But, I think, they would realize it would have some type of [e]ffect on her."

The Defendant wanted additional time in order for the vaginal swabs to undergo an additional DNA analysis in an effort to identify the male contributor. The Defendant knew about the TBI report relative to the DNA analysis when he received the discovery package on or around May 31, 2012. Trial counsel told the trial court that he spoke to the TBI analyst

four months before the motion hearing, which was held about one to two weeks before the trial. The prosecutor told the court at the motion hearing and the trial transcript confirms that the State offered no DNA evidence linking the Defendant to the sexual assault. To the contrary, the victim testified that the Defendant wore a condom, and the State conceded that given the victim's prostitution history, the semen contained in the sample was probably from someone other than the Defendant. As a result, even if the additional test would have shown the Defendant was not the source of the semen, the State presented sufficient evidence of the offense through the victim's testimony regarding the Defendant's conduct. The Defendant has failed to show that he was denied a fair trial or that the result of the trial would have been different had the court granted the motion to continue. We conclude that the court did not abuse its discretion on this basis.

Relative to the expert, the Defendant argues that the trial court erred by denying his request for funds to hire an expert to testify regarding the victim's ability to accurately recall the incident given her admitted drug use and mental health disorders. The record reflects that at the motion hearing, the Defendant requested a continuance in order to retain an expert. The record does not reflect that he requested the trial court grant him funds to hire an expert. In any event, the Defendant had not found the relevant expert, although trial counsel had identified multiple experts who *might* have been able to provide relevant testimony. Counsel had been looking for an expert for four to six weeks, and the trial date was scheduled the following week. Likewise, no proof showed that any of the potential experts could provide the desired, favorable testimony for the defense. As a result, the Defendant has failed to show that he was denied a fair trial or that the result of the trial would have been different had the court granted the motion to continue. The Defendant is not entitled to relief on this issue.

## VII

### Motion to Compel

The Defendant contends that the trial court erred by failing to compel the State to produce the police file relative to the victim's acting as a confidential informant and by restricting his cross-examination of the victim about her working as a confidential informant. He argues the State was obligated to produce the police file pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), and Tennessee Rule of Evidence 616. The State responds that the file was irrelevant to show bias against the Defendant and that he failed to show the State violated *Brady*. We agree with the State.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution afford every criminal defendant the right to a fair trial. *See Johnson v. State*, 38 S.W.3d 52, 55 (Tenn. 2001). As a result, the State has a constitutional duty to furnish a defendant with exculpatory evidence pertaining to his guilt or lack thereof or to the potential punishment faced by a defendant. *See Brady*, 373 U.S. at 87.

In order to show a due process violation pursuant to *Brady*, the defendant must prove by a preponderance of the evidence that (1) he requested the information, unless it is obviously exculpatory, (2) the State must have suppressed the information, (3) the information must be favorable to the accused, and (4) the information must be material. *State v. Edgin*, 902 S.W.2d 387, 389 (Tenn. 1995). Favorable evidence includes that which "challenges the credibility of a key prosecution witness." *Johnson*, 38 S.W.3d at 56-57 (internal quotation marks and citation omitted). Evidence is material when "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 58 (quoting *Edgin*, 902 S.W.2d at 390).

Tennessee Rule of Evidence 616 states that "[a] party may offer evidence by cross-examination, extrinsic evidence, or both, that a witness is biased in favor of or prejudiced against a party or another witness." Rule 611 states that "[a] witness may be cross-examined on any matter relevant to any issue in the case, including credibility[.]" Tenn. R. Evid. 611(b). A trial court's ruling regarding such evidence is reviewed for an abuse of discretion. *State v. Sayles*, 49 S.W.3d 275, 279 (Tenn. 2001).

The Defendant filed a motion for the production of exculpatory and favorable evidence relative to the victim's possibly working with the Metropolitan Police Department as a confidential informant. The defense argued in the motion that such a relationship might show the police department's bias in the investigation and that such information reflected upon the victim's character for truthfulness.

At the motion hearing, trial counsel told the trial court that the victim refused to answer counsel's question regarding her working as an informant. Counsel argued that the victim's acting as an informant was reflective of her credibility and that the victim's credibility was a critical issue. He argued that the file could show someone else committed the offense and that the file showed police bias in favor of the victim. Counsel stated that he wanted to know whether the victim had been an informant and the number of times she had been an informant, but he did not want details of the cases. The trial court found that the Defendant had a right to know whether the victim was a confidential informant. When counsel asked the court to clarify its ruling, the judge said, "I think the State should at least tell you whether she has been a confidential informant, but beyond that, only under certain

circumstances would you be allowed to have the contract, etcetera." The matter was not addressed again until the trial.

At a jury-out hearing at the trial, the victim testified that she had previously worked as a confidential informant for the police department. She said that the incident in this case occurred in January 2012, and that she began working as an informant later in 2012. She said she worked as an informant in "July, August, September, something like that, of 2012." Trial counsel told the trial court that he did not think the victim's testimony was accurate, and the victim said, "It's very accurate."

The victim testified that she became a confidential informant after she was stopped by the police. The police found drug paraphernalia on her person, and the police told her that she could "work that charge off." She said, though, she ended up serving jail time for that charge. She said she worked with Detective Donte Wade of the Rivergate Precinct, although he was not the officer who arrested her. She said the officer who arrested her contacted Detective Wade about her possibly working as an informant. She said that although she had been approached by the police previously to work as an informant, she had always refused until she received the paraphernalia charge. She said that her father's failing health caused her to decide to work with the police because she did not want to go to jail. She said the agreement was for her to participate in three controlled drug buys. She said she worked for the police for one month.

Trial counsel argued that he thought the victim was lying and that he thought the victim had been a confidential informant for a lengthy period of time. The trial court told counsel that he was free to call Detective Wade as a witness at the trial to question him about the victim's work. Counsel asked for a continuance to speak with Detective Wade, but the court denied the motion and told counsel to either contact or subpoena the detective. Counsel said the State was in possession of information that could rebut the victim's testimony but was not being required to produce it under *Brady* and the rules of discovery. The court said the State was obligated to produce the police file if it was exculpatory. Counsel argued that if the victim were lying, information rebutting her testimony would have been exculpatory. The court denied counsel's request to compel the State to produce the police file.

We note that the victim's testimony shows that she did not work as a confidential informant before the incident in this case and that she participated in three controlled drug buys sometime between June and September 2012, after the incident in this case. As a result, the record fails to show that the victim was prejudiced against the Defendant or that the police officers investigating this case were biased in favor of the victim. Therefore, the evidence was not admissible pursuant to Tennessee Rule of Evidence 616. We note that Detective Wade was the victim's contact for the controlled buys and that Detective Baltz

investigated the incident in this case. No evidence was presented that the detectives worked in the same precinct, knew each other, or discussed either case. We note, too, that no evidence shows that the Defendant was the target of any of the controlled buys in which the victim participated. To the contrary, the record reflects no connection between the victim's working as a confidential informant and the Defendant.

Relative to *Brady*, we conclude that the Defendant has failed to show by a preponderance of the evidence that the State violated his constitutional rights. The Defendant fails to show that the State suppressed the police file he sought or that the State knew the victim worked as a confidential informant. Until the victim testified at the jury-out hearing, trial counsel only suspected the victim worked as an informant but had no proof. The State is not required to investigate for the Defendant. *See State v. Reynolds*, 671 S.W.2d 854, 856 (Tenn. Crim. App. 1984) (stating *Brady* does not require the State to investigate for a defendant). The victim's testimony shows that she worked as an informant after the incident in this case and that it was unrelated to the Defendant. In fact, no evidence was presented showing that the Defendant was the target of her work for the police. Likewise, her motive for working with the police was to prevent serving jail time for a possession of drug paraphernalia conviction while her father's health was poor. Although the Defendant claims evidence of the victim's dealings with the police was favorable to the defense because it related to her credibility, nothing about the victim's informant duties reflected upon her credibility related to the sexual assault allegation. Counsel's suspicion that the victim was lying about when she was an informant was not evidence and did not reflect on the victim's credibility. Nothing about the victim's working for the police reflected a reasonable probability that the result of the trial would have been different had the file been disclosed to the defense. In any event, the Defendant impeached the victim's credibility extensively relative to her drug use, her mental health history, and her previous criminal convictions, many of which were offenses involving dishonesty. As a result, the Defendant has failed to show that evidence of the victim's acting as an informant would have changed the outcome of the trial. The Defendant is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the trial court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE